**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STACIE PHILLIPS, individually and on behalf of all others similarly situated, <br><br> *Plaintiff,* <br><br> v. <br><br> SITUSAMC HOLDINGS CORPORATION, <br><br> *Defendant.* | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Stacie Phillips ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant SitusAMC Holdings Corporation ("SitusAMC" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

### I.      INTRODUCTION

1.      This class action arises from a recent data security incident involving the Defendant, which Defendant became aware of on November 12, 2025.[1] This incident resulted in a breach of the Defendant's computer network systems (the "Data Breach") and the subsequent disclosure of personally identifiable information ("PII") belonging to Defendant's customers (collectively referred to as "Class Members"). The Private Information at issue was maintained by the Defendant on its computer network systems.

---

[1] https://www.situsamc.com/databreach

2.      On November 22, 2025, Defendant issued an official statement stating it had determined that certain information from its systems had been compromised, including accounting records and legal agreements.[2]

3.      On November 23, 2025, the New York Times reported that the FBI is in contact with the groups linked to the cyberattack.[3]

4.      SitusAMC provides specialized technology, data, and advisory services supporting the origination, transaction, management, servicing, and valuation across the commercial and residential real estate finance industry.[4]

5.      Some of Defendant's clients include several major US banks, such as JPMorgan Chase and Citi, which were impacted by the data breach.[5]

6.      Defendant obtained, collected and maintained the Plaintiff's and Class Members' Private Information on Defendant's computer network systems as part of its services to its clients.

7.      Defendant's computer network system lacked the adequate and reasonable cyber-security procedures and protocols necessary to effectively defend its data, leaving the Plaintiff's and Class Members' Private Information unprotected.

8.      Defendant left its computer network system vulnerable to unauthorized access by cyber-criminals. Upon information and belief, cyber-criminals took advantage of the vulnerabilities in Defendant's computer network to gain access to the Private Information held on Defendant's computer network systems.

9.      The Plaintiff's and Class Members' Private Information was held on Defendant's

---

[2] *Id.*
[3] https://www.nytimes.com/2025/11/22/business/bank-data-hack.html
[4] https://www.situsamc.com/about-us-who-we-are
[5] https://www.cpomagazine.com/cyber-security/jpmorgan-chase-citi-morgan-stanley-and-other-major-us-banks-impacted-by-data-breach-at-situsamc/

computer network at the time the cyber-criminals were able to gain access to it.

10.    Upon information and belief, Defendant was on notice that failure to implement adequate and reasonable cyber-security procedures and protocols left the Private Information in a dangerous condition and that a data breach was likely to occur exposing the Private Information to cyber-criminals.

11.    The Private Information remains in the hands of the cyber-criminals and is likely to be disclosed on the dark web or to data brokers.

12.    Plaintiff, individually, and  on behalf of those similarly situated, brings this class action lawsuit addressing the Defendant's inadequate safeguarding of Class Members' Private Information and for failing to provide timely and adequate notice to Plaintiff and other Class Members informing Plaintiff and Class Members of the Data Breach and that the Private Information was subjected to unauthorized access by cyber-criminals and precisely what specific type of information was accessed.

13.    Plaintiff's and Class Members' identities, physical safety, and financial stability are now at risk because of Defendant's negligent conduct since the Private Information that Defendant held on its computer network system is now possessed by cyber-criminals.

14.    Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.    Through this Complaint, Plaintiff seeks to remedy these harms, individually, and on behalf of all similarly situated individuals whose Private Information was accessed, disclosed, encrypted and taken during the Data Breach.

16.    Plaintiff seeks remedies including, but not limited to, compensatory damages,

reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

17.    Accordingly, Plaintiff Stacie Phillips sues Defendant SitusAMC seeking redress for its unlawful conduct and asserts claims for: (i) negligence, (ii) breach of implied contract, and (iii) unjust enrichment.

## II.    PARTIES

18.    Plaintiff Stacie Phillips at all times mentioned herein is an individual citizen of South Carolina, residing in the city of Timmonsville.

19.    Defendant SitusAMC Holdings Corporation is a New York Corporation with its principal place of business at Tower 49, 12 East 49th Street, New York, New York 10017.

## III.    JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are at least 100 putative Class Members and members of the proposed Class, including Plaintiff, are citizens of states different from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

21.    This Court has jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Cornwell's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(l) because a substantial part of the events giving rise to this action occurred in this District. Defendant is also

based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members from and/or in this District.

## IV. FACTUAL ALLEGATIONS

### A. DEFENDANT'S BUSINESS

23.     Defendant SitusAMC is the leading independent provider of specialized technology, data, advisory, and outsourcing solutions supporting the entire lifecycle of commercial and residential real estate finance. Its services include mortgage origination, loan underwriting and servicing, asset management, and valuation of real estate debt and equity.[6]

24.     SitusAMC's clients include major US banks and financial institutions, such as JPMorgan Chase, Citigroup, and Morgan Stanley. In the ordinary course of its business, SitusAMC manages billions of loan-related documents annually, requiring it to store and process extensive personal information, including financial account details, legal agreements, and Social Security numbers.[7]

25.     At a time unknown to Plaintiff, and for reasons unknown to Plaintiff, SitusAMC entered into contracts to provide services to JPMorgan Chase, Citigroup, and/or additional financial-institution clients. These contracts required SitusAMC to receive, store, and process sensitive customer information belonging to consumers like Plaintiff and the Class.

26.     Plaintiff and the Class are current and former customers of financial-institution clients of SitusAMC, including but not limited to JPMorgan Chase and Citigroup. These financial institutions provided SitusAMC with consumer information in connection with SitusAMC's contracted services.

---

[6] https://www.situsamc.com/about-us-who-we-are
[7] https://www.cpomagazine.com/cyber-security/jpmorgan-chase-citi-morgan-stanley-and-other-major-us-banks-impacted-by-data-breach-at-situsamc/

27.    In the ordinary course of business, financial institutions such as JPMorgan Chase and Citigroup require customers, including Plaintiff, to provide sensitive personal and financial information, including names, dates of birth, Social Security numbers, financial-account information, loan information, and other personally identifiable information.

28.    On information and belief, Defendant SitusAMC, in the course of performing services for its financial-institution clients, collected, stored, and maintained this Private Information on its computer systems and networks located at its various business locations throughout the United States.

29.    Based on SitusAMC's contractual relationships with its financial-institution clients and the known sensitivity of the consumer information those clients entrusted to it, Defendant agreed to and undertook legal and contractual duties to maintain the confidentiality, integrity, and security of the Private Information. These duties included ensuring that SitusAMC's computer systems and data-handling practices complied with applicable federal and state laws, regulations, industry standards, and the reasonable expectations of the financial-institution clients and their customers.

## B. THE DATA BREACH

30.    A Data Breach occurs when unauthorized cyber criminals access a computer network system that has not been adequately and reasonably secured.

31.    On November 25, 2025, Defendant posted a sample client letter on its website that stated in part:[8]

> Following up on our prior communications, on or about November 12, 2025, SitusAMC ("we" or the "Company") became aware of an incident that resulted in certain information from our systems being compromised. As described further below, we have now confirmed that

---

[8] https://www.situsamc.com/databreach

certain information related to you was acquired by an unauthorized third-party during the incident.

***What Information Was Involved***: While our investigation remains ongoing, we want to provide you with an update regarding certain information related to you that we have determined was acquired by the unauthorized actor. Specifically, we have file paths associated with certain files that were acquired by the unauthorized actor. We conducted word searches against these file paths to identify file paths that include your name in the file path. The searched file paths are related to (i) files associated with our residential Collateral and Asset Management (CAM) system, and (ii) SitusAMC corporate files that generally include legal contracts and accounting documents. We note that this is not a review of the content of any impacted files, but rather a listing of relevant file paths likely related to you. A list of these file paths is attached hereto for your review.

32.    Plaintiff and Class Members provided Defendant with their Private Information reasonably expecting and belief that Defendant had implied a promise and accepted the responsibility to keep such information confidential and secure from unauthorized access as part of their contract to do business together.

33.    Defendant's data security obligations were particularly important given the substantial increase in Data Breaches in the financial services industry preceding the date of the breach.

34.    In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[9] Of the 2023 recorded data breaches, 744 of them, or over 23%, were in the financial services industry.[10] The 744 reported breaches reported in 2023 exposed over 61 million sensitive records. This is up from 2022 where there were a reported 269 breaches exposing approximately 27 million sensitive records.[11]

---

[9] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited November 24, 2025).
[10] *Id.*
[11] *Id.* at 11, Fig.3.

35.     Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

36.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

### C. DATA BREACHES ARE PREVENTABLE

37.     Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

38.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

39.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[12]

40.     To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

•     Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

•     Enable strong spam filters to prevent phishing emails from

---

12 How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Dec. 3, 2025)

reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

•    Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

•    Configure firewalls to block access to known malicious IP addresses.

•    Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

•    Set anti-virus and anti-malware programs to conduct regular scans automatically.

•    Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

•    Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

•    Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

•    Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

•    Consider disabling Remote Desktop protocol (RDP) if it is not being used.

•    Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

•    Execute operating system environments or specific programs in a virtualized environment.

•    Categorize data based on organizational value and implement

physical and logical separation of networks and data for different
organizational units.[13]

41.    To prevent and detect cyber-attacks or ransomware attacks, Defendant could and

should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team,

the following measures:

**Secure Internet-Facing Assets**
-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
-    Prioritize and treat commodity malware infections as potential full
compromise;

**Include IT Pros in security discussions**
-    Ensure collaboration among [security operations], [security
admins], and [information technology] admins to configure servers and
other endpoints securely;

**Build credential hygiene**
-    Use [multifactor authentication] or [network level authentication]
and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**
-    Monitor for adversarial activities
-    Hunt for brute force attempts
-    Monitor for cleanup of Event Logs
-    Analyze logon events;

**Harden infrastructure**
-    Use Windows Defender Firewall
-    Enable tamper protection
-    Enable cloud-delivered protection
-    Turn on attack surface reduction rules and [Antimalware Scan
Interface] for Office[Visual Basic for Applications].[14]

42.    Given that Defendant was storing the Private Information of Defendant's clients'

---

[13] *Id.* at 3-4.
[14] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed Dec. 3, 2025).

current and former customers on behalf of Defendant's clients, Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

43.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

**D. DEFENDANT ACQUIRES, COLLECTS & STORES CUSTOMERS OF DEFENDANT'S CLIENTS' PRIVATE INFORMATION**

44.    Defendant acquires, collects, and stores Private Information on behalf of its clients, such as JPMorgan Chase, Citigroup, Morgan Stanley.

45.    As a condition of becoming a customer of one of Defendant's clients, Defendant's clients' requires all customers to entrust them with highly sensitive personal information.

46.    By obtaining, collecting, and using Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

47.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have let Defendant's clients entrust it to Defendant absent a promise to safeguard that information.

48.    Upon information and belief, while collecting Private Information, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

49.    Defendant's clients, on behalf of Plaintiff and the Class Members, relied on Defendant to keep their Private Information confidential and securely maintained, to use this

information for business purposes only, and to make only authorized disclosures of this information.

### E.  VALUE OF PRIVATE INFORMATION

50.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15]The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]

51.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[17]

52.     For example, Personal Information can be sold at a price ranging from $40 to $200.[18]Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19] Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit

---

[15] 17 C.F.R. § 248.201 (2013).
[16] *Id.*
[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
[18] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[19] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

53.    It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised for some Class Members in the Data Breach, are among the worst kind of Private Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

54.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

Defendant knew or should have known of the risks and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## F.  DEFENDANT FAILS TO COMPLY WITH FTC GUIDELINES

55.    The Federal Trade Commission ("FTC") has promulgated many guides for

businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

56.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal Private Information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[20]

57.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[21]

58.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

59.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect the Private Information in their possession by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an *unfair act or practice* prohibited by Section 5 of the Federal

---

[20] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Dec. 3, 2025).
[21] *Id.*

Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[emphasis added].

60.    Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

61.    Defendant failed to properly implement basic data security practices.

62.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers of Defendant's clients' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

63.    Defendant was always fully aware of its obligation to protect the PII of its clients' customers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

## G.  DEFENDANT FAILS TO COMPLY WITH INDUSTRY STANDARDS

64.    As shown above, experts studying cyber security routinely identify banks and their affiliates as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

65.    Several best practices have been identified that a minimum should be implemented by entities like Defendant, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

66.    Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against

any possible communication system; training staff regarding critical points.

67.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

68.     These foregoing frameworks are existing and applicable industry standards in the industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

## H.  *PLAINTIFF AND THE CLASS MEMBERS HAVE AND WILL EXPERIENCE SUBSTANTIAL HARM*

69.     Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

70.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

71.     Because of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

- The loss of the opportunity to control how their PII is used;

- The diminution in value of their PII;

- The compromise and continuing publication of their PII;

- Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

- Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

- Delay in receipt of tax refund monies; Unauthorized use of stolen PII; and

- The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

72. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

73. The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

74. It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

75. One such example of criminals using PII for profit is the development of "Fullz" packages.

76. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz"

packages.

77.     The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

78.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.[22]

79.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.[23]

80.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

81.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the

---

[22] https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120
[23] *Id.*

emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

82.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

83.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[24]

84.    The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

- encrypting information stored on computer networks;

- retaining payment card information only as long as necessary;

- properly disposing of personal information that is no longer needed;

- limiting administrative access to business systems;

- using industry-tested and accepted methods for securing data;

---

[24] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009).(last visited July 31, 2025)

- monitoring activity on networks to uncover unapproved activity;

- verifying that privacy and security features function properly;

- testing for common vulnerabilities; and

- updating and patching third-party software.

85.     According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[25]

86.      The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

87.     Defendant's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

88.     Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## I.   DATA BREACHES PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTITY THEFT

89.     Data Breaches such as the one experienced by Defendant's clients' customers are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

90.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face

---

[25] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited Dec. 3, 2025 ).

"substantial costs and time to repair the damage to their good name and credit record."[26]

91.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[27]

92.    Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

93.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

94.    Theft of Private Information is gravely serious. PII is a valuable property right.[28] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward

---

[26] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 3, 2025) ("GAO Report").

[27] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited Dec. 3, 2025).

[28] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

analysis illustrates beyond doubt that Private Information has considerable market value.

95.    It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

> *See* GAO Report, at p. 29.

96.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

97.    There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

98.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[29]

99.    PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[29] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (last visited Dec. 3, 2025).

100.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[30]

101.    Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[31]

102.     Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

103.    It is also hard to change or cancel a stolen Social Security number.

104.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[32]

105.    Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## V.    DEFENDANT'S BREACH

106.    Defendant breached its obligations to Plaintiff and Class Members and/or was

---

[30] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Dec. 3, 2025).
[31] *Id* at 4.
[32] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Dec. 3, 2025).

otherwise negligent and reckless because it failed to properly maintain and safeguard its computer

systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following

acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect customers' Private Information;

c.    Failing to properly monitor its own data security systems for existing intrusions;

d.    Failing to train employees in the proper handling of emails containing malicious software, and to and maintain adequate email security practices;

e.    Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

f.    Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

g.    Failing to adhere to industry standards for cybersecurity.

107.    As the result of computer systems needing security upgrading, inadequate

procedures for handling emails containing ransomware or other malignant computer code, and

inadequately trained employees who opened files containing the ransomware virus, Defendant

negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

108.    Plaintiff and Class Members now face an increased risk of fraud and identity theft.

## VI.    PLAINTIFF'S EXPERIENCE

109.    Plaintiff Stacie Phillips is and at all times mentioned herein was an individual

citizen of South Carolina, residing in the city of Timmonsville.

110.    Plaintiff is a customer of JP Morgan Chase Bank, N.A., a customer of Defendant,

and held a mortgage with Defendant through JP Morgan Chase.

111.    Plaintiff is careful about sharing her sensitive Private Information. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

112.    Plaintiff stores any documents containing her sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her sensitive online accounts.

113.    Had Plaintiff been aware that Defendant's computer systems were not secure, she would not have entrusted her personal data to Defendant.

114.    Because of the Data Breach, Defendant advised Plaintiff to take certain steps to protect her Private Information and otherwise mitigate her damages.

115.    Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate her damages by, among other things, monitoring her accounts for fraudulent activity.

116.    Even with the best response, the harm caused to Plaintiff cannot be undone.

117.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of her privacy.

118.    Plaintiff has suffered imminent and impending injury arising from the exacerbated

risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

119.    Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches

## VII.    PLAINTIFF AND CLASS MEMBERS DAMAGES

120.    To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach.

121.    Defendant's failure to compensate is wholly inadequate as it fails to make whole all victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it provides no compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information.

122.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

123.    Plaintiff's Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

124.    Plaintiff and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

125.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

126.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

127.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

128.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

129.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

130.    Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

131.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

132.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

     a.    Finding fraudulent charges;

     b.    Canceling and reissuing credit and debit cards;

c.    Purchasing credit monitoring and identity theft prevention;

d.    Addressing their inability to withdraw funds linked to compromised accounts;

e.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f.    Placing "freezes" and "alerts" with credit reporting agencies;

g.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h.    Contacting financial institutions and closing or modifying financial accounts;

i.    Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j.    Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.    Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

133.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

134.    Further, because of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

135.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an

increased risk of future harm.

## VIII.   CLASS REPRESENTATION ALLEGATIONS

136.    This action is brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

137.    Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated.

138.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All individuals whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach, including those who received notice of the Data Breach (the "Class").**

139.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

140.    Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

141.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff now but, upon information and belief, the class is comprised of thousands of members. Thus, the Class is sufficiently numerous to warrant certification.

142.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.  Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.  Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e.  Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.  Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.  Whether Plaintiff and Class Members suffered legally cognizable damages from Defendant's misconduct;

i.  Whether Defendant's conduct was negligent;

j.  Whether Defendant's acts, inactions, and practices complained of herein amount to breach of implied contractual duties;

k.  Whether Defendant was unjustly enriched;

l.  Whether Defendant failed to provide notice of the Data Breach promptly; and

m.  Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

143.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class

Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

144.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

145.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

146.    <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

147.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a

Class-wide basis.

148.    Likewise, issues that will arise in this case are appropriate for class certification because such issues are common to the Class, the resolution of which would advance matter and the parties' interests therein. Such issues include, but are not limited to:

   a.  Whether Defendant failed to timely notify the public of the Data Breach;

   b.  Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

   c.  Whether Defendant's security measures to protect its data systems were reasonable considering best practices recommended by data security experts;

   d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

   e.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

   f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

149.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant

## IX.    CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
### (On Behalf of Plaintiff and All Class Members)

150.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

151.    Defendant required its clients to submit non-public personal information as a condition of receiving services. A portion of the information provided to Defendant by its clients included the Private Information of Plaintiff and Class Members.

152.    By collecting and storing this data in Defendant's computer property, and sharing

it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

153.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

154.    Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and the customers of Defendant's clients, which is recognized by laws and regulations including as well as common law. Defendant could ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

155.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

156.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

157.    Defendant breached its duties, and thus was negligent, by failing to use reasonable

measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

     a.     Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

     b.     Failing to adequately monitor the security of its networks and systems;

     c.     Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

     d.     Allowing unauthorized access to Class Members' Private Information;

     e.     Failing to detect timely that Class Members' Private Information had been compromised;

     f.     Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

     g.     Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

158.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

159.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

160.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

161.    Defendant's negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

162.     Plaintiff and Class Members are also entitled to injunctive relief requiring

Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## SECOND COUNT
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and All Class Members)

163.    Plaintiff re-alleges and incorporate the above allegations as if fully set forth herein.

164.    When Plaintiff and Class Members provided their Private Information to Defendant's clients in exchange for financial services, they entered implied contracts with Defendant's clients which had assignable and/or transferrable duties which Defendant assumed and agreed to reasonably protect such information provided by Defendant's clients.

165.    Defendant solicited, offered, and invited Class Members via Defendant's clients to provide their Private Information as part of Defendant's regular business practices. Defendant's clients, on behalf of Plaintiff and Class Members, accepted Defendant's offers and provided their Private Information to Defendant.

166.    In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant federal and state laws and regulations and adhered to industry standards.

167.    Plaintiff and Class Members paid money to Defendant or provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

168.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

169.    Plaintiff and Class Members would not have entrusted their Private Information to

Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

170.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

171.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

172.    As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

173.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

174.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**THIRD COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and All Class Members)**

175.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

176.    Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of implied contract count above.

177.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

178.    As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the portion of each

payment made that is allocated to data security is known to Defendant.

179.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Defendant's acceptance and storage of Plaintiff's and the other Class members' Private Information created a fiduciary relationship between Defendant on the one hand, and Plaintiff and the other Class members, on the other hand. In light of this relationship, Defendant must act primarily for the benefit of its employees, clients, patients, and/or customers, which includes safeguarding and protecting Plaintiff's and the other Class members' Private Information.

180.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

181.    Defendant enriched itself by saving the costs Defendant reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by using cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

182.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

183.    Defendant failed to secure Plaintiff's and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiff and Class Members provided.

184.    Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

185.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

186.    Plaintiff and Class Members have no adequate remedy at law.

187.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to:

     a.    actual identity theft;

     b.    the loss of the opportunity of how their Private Information is used;

     c.    the compromise, publication, and/or theft of their Private Information;

     d.    out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

     e.    lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

     f.    the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

     g.    future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiff and Class Members.

188.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

189.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## X.    PRAYER FOR RELIEF

190.    WHEREFORE, Plaintiff, on behalf of herself and the Class described above seek the following relief:

a.    For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiff and their counsel to represent the Class, and finding that Plaintiff are proper representatives of the Class requested herein;

b.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c.    For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e.    Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g.    For an award of punitive damages, as allowable by law;

h.    For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.    Pre- and post-judgment interest on any amounts awarded; and

j.    Any other relief that this court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 3, 2025                    Respectfully submitted,

                                           */s/ Alyssa Tolentino*
                                           Alyssa Tolentino
                                           SDNY Bar No. 6195481
                                           Tyler Bean*
                                           **SIRI & GLIMSTAD LLP**
                                           745 Fifth Avenue, Suite 500
                                           New York, New York 10151
                                           Tel: (212) 532-1091
                                           E: atolentino@sirillp.com
                                           E: tbean@sirillp.com

                                           Leigh S. Montgomery*
                                           Texas Bar No. 24052214
                                           **EKSM, LLP**
                                           4200 Montrose Blvd, Suite 200
                                           Houston, Texas 77006
                                           Phone: (713) 244-6363
                                           Fax: (888) 276-3455
                                           E: lmontgomery@eksm.com

                                           **COUNSEL FOR PLAINTIFF AND THE
                                           PUTATIVE CLASS**

                                           (* denotes *pro hac vice* forthcoming)